UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| STEPHANIE COOPER, as parent and natural guardian of A.C., a minor, | NO: _____ |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| CHIPOTLE MEXICAN GRILL, INC., a Delaware corporation, | **(JURY TRIAL DEMANDED)** |
| Defendant. | |

Plaintiff Stephanie Cooper, on behalf of her minor daughter A.C., for their Complaint and causes of action against the above-named Defendant, states and alleges as follows:

## INTRODUCTION

1. This lawsuit arises out of an outbreak of *E. coli* O157:H7 associated with the consumption of food prepared and sold by Defendant Chipotle Mexican Grill, Inc. ("Chipotle"). Chipotle sold contaminated food products to Plaintiff's minor daughter and, as a result, A.C. was infected with deadly Shiga-toxin producing *E. coli* ("STEC"), which caused severe illness, injury, and damages.

2. As a result of Chipotle's disregard for the health and safety of the public, Chipotle is liable to Plaintiff and A.C. for damages.

## PARTIES

3. At all times material, Plaintiff Stephanie Cooper was the parent and natural guardian of her minor daughter, A.C.

4. At all times material, Plaintiff and A.C. resided in Delaware County, Ohio.

1

5. Chipotle is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Newport Beach, California. At all relevant times, Chipotle operates over 2,700 restaurants and sells food products to customers throughout the United States, including to customers in Ohio.

6. At all times material hereto, Chipotle operated a restaurant located at 1140 Polaris Parkway, Columbus, Ohio.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and because Defendant has certain minimum contacts with the State of Ohio such that the maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

8. Venue in the United States District Court for the Southern District of Ohio is proper pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

**FACTUAL ALLEGATIONS**

*E. coli* **O157:H7**

9. *E. coli* O157:H7 is a foodborne pathogen highly toxic when consumed by humans. *E. coli* O157:H7 infections typically result in severe stomach cramps, diarrhea, bloody diarrhea, and vomiting. Even if the acute gastrointestinal symptoms subside, those sickened are at dramatically increased risk for a variety of chronic conditions, including high blood pressure and chronic kidney disease. The infectious process can also cause much more severe injuries, including complete kidney failure and death. The elderly, the young, and those with compromised immune

systems are at particular risk of both contracting *E. coli* O157:H7 infections and sustaining serious death or injury.

10. An estimated 73,480 illnesses due to *E. coli* O157:H7 infections occur each year in the United States, leading to an estimated 2,168 hospitalizations and 61 deaths.

11. *E. coli* O157:H7 lives in the intestines of cattle and other ruminants. *E. coli* O157:H7 is also notable among pathogenic bacteria for its extremely low infectious dose – that is, the number of bacteria necessary to induce infection in a person. While for most pathogenic bacteria it takes millions of bacterial colonies to cause illness, it is now known that fewer than 50 *E. coli* O157:H7 bacteria can cause illness in a child. The practical import is that even a microscopic amount of exposure can trigger a devastating infection.

12. The most severe cases of *E. coli* O157:H7 infection occur in young children and the elderly because the immune systems in those age populations are the most vulnerable. After a susceptible individual ingests *E. coli* O157:H7, the bacteria attach to the inside surface of the large intestine and initiates an inflammatory reaction of the intestine. What ultimately results is the painful bloody diarrhea and abdominal cramps characteristic of the intestinal illness.

13. The mean incubation period (time from ingestion to the onset of symptoms) of *E. coli* O157:H7 is estimated to be two to four days (range, 1-21 days). Typically, a patient with an acute *E. coli* O157:H7 infection presents with abdominal cramps, bloody diarrhea, and vomiting. The duration of diarrhea in children with *E. coli* O157:H7 infections is significantly longer than that of adults.

14. *E. coli* O157:H7 can produce a wide spectrum of disease from mild, non-bloody diarrhea, to severe bloody diarrhea accompanied by excruciating abdominal pain, to life-threatening complications. Antibiotics do not appear to aid in combating these infections, and

recent medical studies suggest that antibiotics are contraindicated for their risk of provoking more serious complications. Apart from good supportive care, which should include close attention to hydration and nutrition, there is no specific therapy.

15. STEC can be found in a variety of foods. In recent years, fecal contamination has led to large-scale STEC outbreaks linked to fresh produce.

16. Because of the severe health risks and the significant public health costs posed by STEC, the Centers for Disease Control ("CDC") in conjunction with state health actively monitor STEC cases throughout the country to identify the illness-causing food and stop outbreaks.

17. State and CDC labs routinely perform testing on STEC samples to perform further genetic subtyping process known as Whole Genome Sequencing ("WGS"). The WGS results—akin to genetic fingerprints—are then loaded into a national database where they are easily compared to each other.

18. This system alerts the state departments of health and the CDC when the number of STEC cases spikes or when a group of cases are caused by the same, or closely related, genetic strain of the bacteria. The CDC or the state then investigates those cases as a single-source outbreak.

**Chipotle's Food Safety Problems**

19. Chipotle has been involved in several foodborne illness outbreaks over the years including the following:

   a. 2015: two *E. coli* O26 outbreaks in California, Delaware, Illinois, Kentucky, Maryland, Minnesota, New York, Ohio, Oregon, Pennsylvania, and Washington;

   b. 2015 to 2018: *Norovirus* outbreaks in California, Massachusetts, Virginia, and Ohio;

    c. 2015: *Salmonella* outbreak in Minnesota;

    d. 2009: outbreak of *E. coli* O157:H7 in Colorado, Utah, and New York; and

    e. 2009: outbreak of *Campylobacter* in Minnesota.

20. In April 2020, Chipotle agreed to pay a $25,000,000 fine to resolve criminal charges regarding its sale of adulterated food.

21. Despite these food safety problems, Chipotle made public statements touting the safety of its food. For example, on its website, Chipotle published the following statement from its Vice President of Food Safety:

> … all of Chipotle's team members are committed to pursuing the highest level of excellence when it comes to food safety. I am lucky to work with some of the country's most established authorities to ensure our food safety standards continue to be best-in-class. By adapting techniques and protocols from the worlds of healthcare to fine dining, there is no doubt that Chipotle's food safety work is cutting-edge….

22. In September 2020, Chipotle sold food contaminated with *E. coli* O157:H7 to its customers, including A.C.

23. Chipotle knew, or in the exercise of reasonable care should have known, of the risks posed by *E. coli* O157:H7.

24. Chipotle knew, or in the exercise of reasonable care should have known, of the risks that its food products could become contaminated with *E. coli* O157:H7.

25. Upon information and belief, this *E. coli* contamination resulted from Chipotle's following acts and omissions:

    a. Failing to adequately identify, evaluate, screen, and test for food safety risks;

    b. Failing to maintain and monitor the safety of its products, premises, equipment, and employees;

    c. Failing to properly operate its restaurants in a safe, clean, and sanitary manner;

    d. Failing to adopt, implement, apply, validate, comply with, and follow adequate food safety policies and procedures to ensure the safety and sanitary conditions of its food products, premises, and employees;

    e. Failing to properly train its employees and agents how to prevent the contamination and transmission of STEC;

    f. Failing to properly supervise its employees and agents to prevent the contamination and transmission of STEC;

    g. Failing to source its food products from safe suppliers;

    h. Failing to monitor and validate the safety practices of its suppliers; and

    i. Misrepresenting the quality and suitability of its product for consumption.

### A.C.'s Illness

26. On or about September 22, 2020, A.C. purchased and consumed food from the Chipotle restaurant located at 1140 Polaris Parkway, Columbus, Ohio. During her September 22 visit, A.C. consumed a vegetarian burrito bowl that included romaine lettuce, tomato salsa, guacamole, and other food products.

27. On or about September 24, 2020, A.C. purchased and consumed food from the Chipotle restaurant located at 1140 Polaris Parkway, Columbus, Ohio. During her September 24 visit, A.C. consumed a vegetarian burrito bowl that included romaine lettuce, tomato salsa, guacamole, and other food products.

28. On or about September 27, 2020, A.C. began feeling nauseated with severe diarrhea.

29. On or about September 29, 2020, A.C.'s diarrhea became bloody and far more intense, at which time she sought medical treatment. During the course of her medical treatment, A.C. provided a stool sample.

30. Testing of A.C.'s stool sample confirmed she had been infected with STEC.

31. On or about October 1, 2020, A.C. was admitted to Nationwide Children's Hospital in Columbus, Ohio, where she remained until October 5, 2020.

32. Upon information and belief, A.C.'s *E. coli* infection was caused by contaminated food sold to A.C. by Chipotle.

33. As a direct and proximate result of consuming contaminated food prepared and served by Chipotle, A.C. suffered a debilitating and painful gastrointestinal illness.

34. As a direct and proximate result of consuming contaminated food prepared and served by Chipotle, A.C. and/or Plaintiff incurred, and will incur, medical expenses.

35. As a direct and proximate result of consuming contaminated food prepared and served by Chipotle, A.C. suffered, and will suffer, physical and mental pain, emotional distress, embarrassment, disfigurement, and such other compensatory and economic damages.

## COUNT I
### Strict Product Liability: Defective Manufacture and Supply
### (ORC §§ 2307.74, 2307.78 et seq.)

36. Plaintiff incorporates the preceding paragraphs by reference as if each paragraph was set forth in its entirety.

37. Chipotle served and sold the adulterated food that caused A.C.'s illness.

38. At all times relevant to this action, Chipotle designed, formulated, produced, made, constructed, assembled, processed, and/or manufactured the adulterated food that caused A.C.'s illness. Therefore, Chipotle was a manufacturer as defined in Ohio Revised Code § 2307.71 *et seq.*

39. Chipotle sold, distributed, prepared, blended, packaged, labeled, and otherwise participated in the placing of the adulterated food that caused A.C.'s illness into the stream of commerce. Therefore, Chipotle was a supplier as defined in Ohio Revised Code § 2307.71 *et seq*.

40. Upon information and belief, Chipotle created or furnished the manufacturer of the adulterated food that caused A.C.'s illness with the design or formulation that was used to produce, create, make, construct, or assemble that product or a component of that product.

41. Upon information and belief, Chipotle created, altered, modified, or failed to maintain the food product at issue after it came into Chipotle's possession, and before it left Chipotle's possession, and this alteration, modification, or failure to maintain the product rendered it defective.

42. Chipotle marketed the defective food product under its own label or trade name.

43. Chipotle expected and intended users such as A.C. to consume its food products without substantial change in the condition in which those food products were sold.

44. Food contaminated with STEC is dangerous if eaten and is particularly dangerous to children, the elderly, and anyone with a compromised immune system.

45. The food served by Chipotle and consumed by A.C. was defective as it was contaminated with STEC when it left Chipotle's control. This adulteration represents a material deviation from the design specifications, formula, or performance standards of Chipotle, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards.

46. Because the infective dose of STEC is invisible and odorless, consumers like A.C. have no way of detecting the contamination.

47. A.C.'s consumption of Chipotle's defective food product caused her to become infected with STEC.

48. A.C.'s injuries are a direct and proximate result of Chipotle's acts and omissions.

49. Chipotle is strictly liable to A.C. for the harm proximately caused by the manufacture and sale of its dangerous and defective food.

50. As a result of Chipotle's production and sale of a defectively manufactured product, A.C. sustained injuries and damages set forth in the preceding paragraphs.

## COUNT II
### Strict Products Liability: Defective Design or Formulation
### (ORC § 2307.75)

51. Plaintiff incorporates the preceding paragraphs by reference as if each paragraph was set forth in its entirety.

52. Chipotle's design, formulation, practices, and methods of sourcing ingredients and assembling its food products, including the adulterated vegetarian salad bowl consumed by A.C., presented a foreseeable risk of *E. coli* O157:H7 poisoning in light of the food products' intended and foreseeable use.

53. The foreseeable risks of harm resulting from Chipotle's design, formulation, practices, and methods exceeded the benefits of Chipotle's design, formulation, practices, and methods.

54. Chipotle is strictly liable to A.C. for the harm proximately caused by Chipotle's design, formulation, practices, and methods and its sale of dangerous and defective food.

55. As a direct and proximate result of Chipotle's design, formulation, practices, and methods, A.C. sustained injuries and damages set forth in the preceding paragraphs.

## COUNT III
### Strict Products Liability: Product Defect Due to Inadequate Warning or Instruction
### (ORC § 2307.76)

56. Plaintiff incorporates the preceding paragraphs by reference as if each paragraph was set forth in its entirety.

57. Chipotle knew, or in the exercise of reasonable care, should have known of, the risks posed by *E. coli* O157:H7, and failed to provide adequate warnings concerning these risks that a reasonable manufacturer or supplier would have provided.

58. Chipotle is strictly liable to A.C. for the harm proximately caused by Chipotle's failure to warn or instruct.

59. As a direct and proximate result of Chipotle's failure to adequately warn consumers, A.C. sustained injuries and damages set forth in the preceding paragraphs.

## COUNT IV
### Strict Products Liability
### Product Defect Due Failure to Conform to Representations
### (ORC § 2307.77)

60. Plaintiff incorporates the preceding paragraphs by reference as if each paragraph was set forth in its entirety.

61. At and before the adulterated food product consumed by A.C. left Chipotle's control, Chipotle made representations about the safety of its food products.

62. The food products consumed by A.C. did not conform to Chipotle's representations because those products were adulterated with *E. coli* O157:H7 and were therefore defective.

63. Chipotle is strictly liable to A.C. for the harm proximately caused by Chipotle's failure to conform to its representations about the food product at issue.

64. As a direct and proximate result of Chipotle's failure to conform to its representations about the food product at issue, A.C. sustained injuries and damages set forth in the preceding paragraphs.

### COUNT V
### Negligence

65. Plaintiff incorporates the preceding paragraphs by reference as if each paragraph was set forth in its entirety.

66. Chipotle owed a duty to all of its restaurant patrons who consume its products, including A.C., to serve and sell food that is safe to eat, that is not adulterated with deadly pathogens like STEC, and that is not produced in violation of applicable food safety regulations and industry standards.

67. By and through the acts and omissions set forth in the preceding paragraphs, Chipotle breached its duty of care.

68. Chipotle's practices failed to comply to minimum standards and requirements.

69. Chipotle was negligent and careless in and about its design, manufacturing, supplying, marketing, and sale of the adulterated food consumed by A.C.

70. A.C.'s injuries are a direct and proximate result of the negligence of Chipotle.

71. As a result of Chipotle's negligence, A.C. sustained the injuries and damages—including economic losses—set forth in the preceding paragraphs.

### COUNT VI
### Negligence Per Se
### (21 U.S.C. § 331; ORC §§ 3715.52 and 3715.59)

72. Plaintiff incorporates the preceding paragraphs by reference as if each paragraph was set forth in its entirety.

73. Chipotle, its employees, agents, and those acting on its behalf, as providers of food products in the United States of America, owe a duty to comply with 21 U.S.C. § 331, which states:

The following acts and the causing thereof are prohibited:

(a) The introduction or delivery for introduction into interstate commerce of any food … that is adulterated or misbranded.

(b) The adulteration or misbranding of any food … in interstate commerce.

(c) The receipt in interstate commerce of any food … that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise.

74. A.C. was a member of the class of persons meant to be protected by this statute.

75. Chipotle, its employees, agents, or those working on its behalf, failed to comply with 21 U.S.C. § 331. Such conduct constitutes negligence *per se*.

76. Chipotle, its employees, agents, and those acting on its behalf as providers of food, owed a duty to comply with Ohio Revised Code §§ 3715.52 and 3715.59, which prohibit the sale of foods adulterated with poisonous or deleterious substances such as *E. coli* Ol57:H7.

77. A.C. was a member of the class of persons meant to be protected by this statute.

78. Chipotle, its employees, agents, or those working on its behalf, failed to comply with Ohio Revised Code §§ 3715.52 and 3715.59. Such conduct constitutes negligence *per se*.

79. As a result of the failure of Chipotle's negligence *per se*, A.C. sustained damages as set forth in the preceding paragraphs.

80. The damages sustained by A.C. were the type of damages 21 U.S.C. § 331 and Ohio Revised Code §§ 3715.52 and 3715.59 are meant to prevent.

## COUNT IV
**Breach of Warranties**

81. Plaintiff incorporates the preceding paragraphs by reference as if each paragraph was set forth in its entirety.

82. Upon information and belief, Chipotle expressly and impliedly warranted, through the sale of its food to the public, and by the statements and conduct of its employees and agents, that the food it prepared and sold to the public was fit for human consumption, and not otherwise adulterated or injurious to health.

83. Chipotle had a duty to manufacture and sell food products that would pass without objection in the trade, and were fit for the ordinary purposes for which such goods were intended and used – human consumption.

84. The food produced, served and sold by Chipotle, that caused A.C.'s illness was adulterated with STEC and was in a defective condition unreasonably dangerous to ordinary consumers and members of the public when it left Chipotle's control.

85. Chipotle breached express warranties and the implied warranty of merchantability because the lettuce product manufactured and sold would not pass without objection in the trade, and was unfit for the ordinary purposes for which such goods were intended and used – human consumption.

86. As a direct result of Chipotle's breach of its express and implied warranties, A.C. suffered the injuries and damages set forth in the preceding paragraphs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendant as follows:

A. A trial by jury on all issues;

B. Judgment against Defendant for an amount as found by a jury to compensate A.C. for all of the injuries and losses alleged and all other economic and non-economic damages, in an amount greater than $75,000;

  C. The opportunity to amend or modify the provisions of this Complaint as necessary or appropriate after additional or further discovery is completed, and after all appropriate parties have been served;

  D. Reasonable attorney fees, costs, and expert witness fees, as allowed by law; and

  E. Such other and further relief as may be just and equitable.

DATED: November 6, 2020    Respectfully Submitted,

            */s/ Paul Grieco*
            Paul Grieco (0064729)
            GRIECO LAW, LLC
            623 West Saint Clair Avenue
            Cleveland, OH 44113
            Phone: 216-965-0009
            paul@grieco.law

            and

            PRITZKER HAGEMAN P.A.
            Fred Pritzker (pro hac vice pending)
            Raymond Konz (pro hac vice pending)
            Tariq Miller (pro hac vice pending)
            45 South Seventh Street, Suite 2950
            Minneapolis, MN 55402
            fhp@pritzkerlaw.com
            raymond@pritzkerlaw.com
            tariq@pritzkerlaw.com
            Phone: (612) 338-0202
            Facsimile: (612) 338-0104
            *Attorneys for Plaintiff*